### In the Matter of GP EXPRESS AIRLINES, INC., Debtor.

### Bankruptcy No. BK96–40042.

United States Bankruptcy Court, D. Nebraska.

Jan. 25, 1996.

T. Randall Wright and Angela K. Layden, Dixon & Dixon, P.C., Omaha, NE, for Debtor.

Jeffrey Wegner, Kutak Rock, Omaha, NE, for Unsecured Creditors Committee.

J. Michael Sutherland, Vinson & Elkins, Dallas, TX, Douglas P. Kelly, Continental Airlines, Houston, TX, Steven Turner, for Continental Airlines.

Leslie Rawlings, Raytheon Aircraft Co., Wichita, Kansas, Wm. Biggs, St. Louis, MO, for Raytheon Aircraft Co.

Henry Carriger, Dist. Counsel, IRS, Omaha, NE, for I.R.S.

Susan Knight, Asst. U.S. Atty., Lincoln, NE.

Patricia Dugan, Asst. U.S. Trustee, Omaha, NE.

## MEMORANDUM

JOHN C. MINAHAN, Jr., Bankruptcy Judge.

On January 22, 1996, a trial was held on several urgent matters filed by various parties to this bankruptcy case. Before the court is a motion (Fil. # 17) by which the Debtor, GP Express Airlines, Inc., seeks an order compelling Continental Airlines, Inc., to pay $328,756.00 to the Debtor. This motion is sustained in part and, I order that Continental immediately pay $195,000.00 to the Debtor. Continental Airlines, Inc., also seeks an order of the court lifting the bankruptcy injunction to permit Continental to offset the $328,756.00, as against money owed to Continental by the Debtor. That motion (Fil. # 25) is denied. Also before the court is a motion (Fil. # 49) filed by Raytheon Aircraft Credit Corporation by which it seeks an order of the court lifting the bankruptcy injunction to permit Raytheon to repossess nineteen aircraft of the Debtor. Alternatively, Raytheon seeks an order requiring the Debtor to adequately protect the interest of Raytheon in the aircraft. I deny Raytheon's request to lift the bankruptcy injunction, but formulate an order requiring a minimum expenditure of funds for maintenance of the aircraft. GP Express Airlines, Inc. has filed a motion (Fil. # 28) for leave of the court to use the funds turned over to it by Continental notwithstanding the fact that Raytheon claims an interest in the money. I conclude that Raytheon has no interest under bankruptcy law in the funds to be turned over by Continental Airlines, Inc. to the Debtor pursuant to this order, and the Debtor's motion is sustained.

## FINDINGS OF FACT

GP Express Airlines, Inc. ("Debtor" or "GP Express") filed a voluntary Chapter 11 petition on January 10, 1996. Debtor is a passenger airline which operates nineteen aircraft in nine states, including Nebraska. Nine airplanes are owned by the Debtor and financed by Raytheon Aircraft Credit Corporation, formerly known as Beech Acceptance Credit Corporation ("Raytheon"). The other ten aircraft are leased by the Debtor from Raytheon.

The Debtor, GP Express Airlines, Inc., does not engage in the sale of its own tickets to passengers for transportation on its airline. In March of 1994, Debtor entered into an Amended and Restated Interline Agreement (the "Code Share Agreement") with Continental Airlines, Inc. ("Continental") which has been amended from time to time. Under the Code Share Agreement, Continental sells tickets on Continental ticket stock for travel on GP Express aircraft. In a sense, GP Express Airlines feeds passengers to Continental thus increasing the market of Continental. The Code Share Agreement is comprehensive and deals with many aspects of the relationship between the Debtor and Continental. Relevant to the issues now before the court, the Code Share Agreement provides that on each Thursday, by overnight delivery, Continental shall advance funds to Debtor for estimated revenue due Debtor for passengers already flown by Debtor. The amount of this payment advance is calculated under a formula set forth in the Code Share Agreement. The advance payment represents compensation to the Debtor for passengers carried by the Debtor during the one week period ending the preceding Sunday. The amount of the advance payment is based upon the actual number of passengers carried during that period multiplied by the average fare charged during a preceding period designated under the Code Share Agreement. The advance payment made by Continental represents a payment of an estimated gross amount due and payable to the Debtor without taking into account or deducting all amounts due and owing by the Debtor to Continental under the Code Share Agreement for the relevant period of time. In making the Thursday payment to the Debtor, Continental does, however, make a deduction for certain fuel charges and commissions. Under the terms of the Code Share Agreement there are many charges by Continental to the Debtor for non-transport related items such as ground handling, flight interruption, manifest fees, maintenance, passenger enplanement charges, credit card discounts, travel certificates, baggage deliv-

ery and so forth. These various charges represent claims held by Continental against the Debtor for the period of time for which the advanced payment is made. The advance payment is made without making a deduction for these claims of Continental. The Code Share Agreement, at paragraph 4.3, provides that the Debtor "grants Continental the right to offset charges accrued hereunder and not paid when due against any monies owing from Continental or any affiliate of Continental" to Debtor. Thus, Continental has a right to offset its claims against the Debtor arising under the Code Share Agreement against any monies owed by Continental to the Debtor. Continental also, of course, asserts a common law right to offset.

The Thursday advance payments made by Continental to the Debtor obviously do not resolve or settle the claims as between Continental and the Debtor for the relevant period of time covered by the advance. It is necessary for there to be a reconciliation of claims as between the parties and that is handled in the ordinary course of business through the Airline Clearing House.

Each month the Airline Clearing House settles the accounts of participating air carriers by conducting a net settlement of the invoices submitted by each carrier for services provided by it to other participating carriers. The Airline Clearing House makes a final settlement of the account between Debtor and Continental after the close of each month, taking into account the weekly advance payments made to Debtor by Continental and amounts owed between the parties under the Code Share Agreement and agreements ancillary to the Code Share Agreement. Until the final monthly settlement is determined by Airline Clearing House, the precise amount of the net obligation between Debtor and Continental is not determined.

A review of the Airline Clearing House settlement summary (Exhibit I) for the period of time January 1995, through November 1995, discloses that at the conclusion of settlement each month, the Debtor owed money to Continental for each month during that period of time, except for August, 1995. The only reason that the Debtor was a net creditor in August was because the Debtor, in the opinion of Continental, arbitrarily billed Continental for certain Freedom Passports in direct contravention of the Code Share Agreement. Based on a review of the Airline Clearing House settlement summary and the Code Share Agreement, it appears that the formula used in the Code Share Agreement for calculating the amount of the Thursday advance by Continental to the Debtor is not a very good one from Continental's perspective. Historically, application of the formula requires Continental to advance more money each Thursday to the Debtor than in fact will be owed to Debtor at the conclusion of a full settlement for all charges for the billing period. However, that is the bargain of the parties, and the Debtor is entitled to the benefit of its bargain.

In addition to obligations to Continental under the Code Share Agreement, Debtor is obligated to Continental under the terms of a Promissory Note dated July 28, 1995, in the principal amount of $2,258,111.00. This amount represents, in part, obligations of Debtor under the Code Share Agreement, but the Promissory Note (the "Continental Note") also evidences other obligations between the parties. Debtor defaulted in making payments when due on the Continental Note and, on January 3, 1996, prior to the commencement of this bankruptcy, Continental declared a default under the Note and exercised its right to declare the entire unpaid balance of the Continental Note due and payable. The following day, on January 4, 1996, Continental offset the weekly advance payment due the Debtor of approximately $302,515.00 for application on the Continental Note. This offset caused a cash flow shortage to the Debtor and resulted in the filing of this bankruptcy case on January 10, 1996. The question of whether or not the January 4, 1996, offset by Continental of $302,515.00 is avoidable under section 553 is not before the court in these proceedings.

The day after the filing of this bankruptcy case, on January 11, 1996, Continental in-

formed Debtor that the weekly advance payment due on January 11, 1996, and that part of the weekly advance payment due on January 18, 1996, attributable to pre-petition flights, would not be made. It is Continental's position that, as permitted by the recent Supreme Court decision of *Citizens State Bank v. Strumpf,* —— U.S. ——, 116 S.Ct. 286, 133 L.Ed.2d 258 (1995), it placed an administrative hold or freeze on these funds until the bankruptcy court determines Continental's offset rights. On the petition date, the total amount of the frozen advances due Debtor under the Code Share Agreement for prepetition flights was $328,756.00.

On January 11, 1996, Debtor filed an emergency motion to compel Continental to make the weekly advance payment due January 11, 1996, asserting that any offset by Continental of these funds is improper under Bankruptcy Code § 553 and would violate the automatic stay. Continental resists this motion and asserts that it is exercising the right to place an administrative hold on these funds, pending the determination of its motion seeking relief from the stay to offset these funds against its debt. Continental asserts that its interest in these advance payment funds will not be adequately protected if turned over to the Debtor. Further, Continental asserts that it is entitled to relief from the automatic stay to consummate an offset.

On January 16, 1996, Continental filed an Emergency Motion for Relief from Automatic Stay in order to offset the advance weekly payments due under the Code Share Agreement against its prepetition debt. It is not disputed that the amount Debtor owes Continental is far in excess of the amounts that Debtor is owed by Continental, on prepetition obligations. Furthermore, I specifically conclude that amounts due Continental under the Code Share Agreement, exclusive of amounts evidenced by the Continental Note, exceed $328,756.00.

Raytheon seeks relief from the automatic stay to repossess Debtor's aircraft or alternatively, for an order directing Debtor to make adequate protection payments to Raytheon. Raytheon holds a duly perfected security interest in the nine aircraft which are owed by the Debtor and Raytheon is the owner of ten aircraft which are leased by Raytheon to the Debtor. Raytheon claims that it is entitled to adequate protection payments with respect to these aircraft. In addition, Raytheon holds a duly perfected security interest in Debtor's accounts receivable, including all funds due from Continental under the Code Share Agreement. Furthermore, in addition to holding a security interest in all such receivables under the Code Share Agreement, Raytheon has the right, pursuant to an agreement with Debtor and Debtor's instructions to Continental, to actually be paid $65,000.00 directly by Continental from each weekly advance payment by Continental under the Code Share Agreement.

Raytheon asserts that if the court orders Continental to advance funds to the Debtor, Raytheon has an interest in these funds in the amount of $65,000.00 per week. If the $328,756.00 due from Continental had been disbursed in accordance with the Code Share Agreement, and the assignment to Raytheon, a total of $83,571.00, would have been paid to Raytheon by Continental. The $83,571.00 represents $65,000.00 for one week, plus $18,571.00 for two days of a second week. A settlement was previously reached respecting payment to Debtor attributed to January 10, 1996 through January 14, 1996. Thus, Raytheon asserts that it holds a security interest in $83,571.00 of any funds disbursed by Continental to Debtor from the $328,756.00. In response, Debtor requests the court's permission to use funds in which Raytheon claims an interest. Debtor has offered to adequately protect Raytheon respecting use of these funds.

## DISCUSSION

After considering the general question of whether Continental held an enforceable right to offset respecting the $328,756.00, I will discuss whether or not Continental should be required to turnover funds to the Debtor and the extent to which Raytheon is entitled to adequate protection. I conclude that Continental held an enforceable right to offset on the day this bankruptcy petition

was filed, that Continental shall be required to immediately surrender the sum of $195,000.00 to the Debtor, and that Continental's interest in said $195,000.00 will be adequately protected by revenues from future ticket sales. I also conclude that Raytheon holds no allowed secured claim in funds turned over by Continental to the Debtor pursuant to this order and that, accordingly, Raytheon has no right to adequate protection respecting the $195,000.00. I do conclude, however, that Raytheon is entitled to adequate protection with respect to its interest in the Debtor's aircraft and I require adequate protection respecting aircraft maintenance.

***Continental Offset.***

■ The Debtor and counsel for the unsecured creditors' committee assert four separate reasons in support of the proposition that Continental has no right to offset the $328,756.00. First, it is asserted that there is no right to offset because the amount due to the Debtor from Continental under the Code Share Agreement was not liquidated on the date that the bankruptcy petition was filed, January 10, 1996. Second, it is asserted that Debtor's claim against Continental under the Code Share Agreement constitutes a post-petition claim of the Debtor which may not be offset against Continental's prepetition claim against the Debtor. Third, Debtor asserts that Continental has no right to offset because the parties lack mutuality. Finally, it is asserted that Continental is precluded from taking an offset because Debtor had made the assignment to Raytheon and provided notice thereof to Continental prior to the time that Continental took the offset or froze the account. I conclude that these arguments are all without merit.

First, on January 11, 1996, the day which Continental froze its account with the Debtor and declined to make an advance payment to the Debtor in the amount of $328,756.00, Continental had an enforceable right to offset under applicable non-bankruptcy law. The amount which Continental was required to advance on that date was fixed by a formula set forth in the Code Share Agreement. The fact that the multiplicity of claims between

Continental and Debtor had not been reconciled as of January 11, 1996, is irrelevant. I conclude that a Texas court would find that on January 11, 1996, Continental had an enforceable right to offset. *See Jones v. Hunt,* 74 Tex. 657, 12 S.W. 832 (1889); *Braniff Airways, Inc. v. Exxon Company, U.S.A.,* 814 F.2d 1030, 1035–38 (5th Cir.1987); *Sherman v. First City Bank of Dallas,* 99 B.R. 333, 338 (N.D.Tex.1989), *aff'd* 893 F.2d 720 (5th Cir.1990); *In re Affiliated Food Stores, Inc.,* 123 B.R. 747, 748 (Bankr.N.D.Tex.1991).

■ Second, the fact that Continental did not freeze funds until January 11, 1996, the day after the bankruptcy case was filed, and the fact that Continental was not obligated to make a payment to the Debtor until January 11, 1996, is not dispositive of the question of whether Continental's obligation to pay the Debtor constitutes a post-petition claim which could not be offset against the Debtor's prepetition obligation to Continental. The question of whether or not a claim constitutes a prepetition or post-petition claim is governed by the Eighth Circuit Court of Appeals recent decision in *United States v. Gerth,* 991 F.2d 1428, 1434–35 (8th Cir.1993). In *Gerth,* the Eighth Circuit made clear that for setoff purposes, a debt arises when all transactions necessary for liability occur, regardless of whether the claim was contingent, unliquidated, or unmatured when the bankruptcy case was commenced. *Gerth* at 1433. As of the petition date, January 10, 1996, Continental was obligated absolutely to make an advance to the Debtor in the amount of $328,756.00 and all transactions necessary for Continental's liability to make the advance had occurred. The precise amount of the ultimate net accounts between Continental and Debtor was not reconciled yet through the Airline Clearing House. In this sense, the amounts due and owing between the parties was unliquidated. However, within the meaning of the *Gerth* standard, I conclude that Continental's obligation to make the advance payment constituted a prepetition obligation. The pre-petition obligation to make an advanced payment was an obligation to make a payment on January 11, 1996. But, the date the payment was due is not controlling on the question of whether or

not the claim constitutes a pre-petition claim for purposes of section 553.

Third, I conclude that there is in fact mutuality by and between Debtor and Continental with respect to claims arising under the Code Share Agreement. I have specifically concluded, as a finding of fact, that on January 10, 1996, the petition date, the Debtor owed Continental an amount in excess of $328,756.00 under the Code Share Agreement. Since the Debtor held a claim for $328,756.00 against Continental under the Code Share Agreement and Continental held a claim in excess of that amount against the Debtor under the Code Share Agreement, mutuality existed. With respect to these claims the same parties, acted in the same capacity, with respect to claims arising under the same agreement. It has been suggested by counsel for the creditors' committee that mutuality is also lacking because a principal-agency relationship exists between Continental and the Debtor with respect to the sale of tickets. This argument is conjectural in that it relies on facts not in evidence before the court. I have no evidence from which I would conclude that there is an agreement respecting the sale of tickets by and between Continental and the Debtor pursuant to which Continental is acting as an agent of GP Express Airlines, Inc. for ticket sales. I have some evidence that such agreement might exist, but the existence of the agreement has not even been established as a matter of fact. Under the Code Share Agreement, it is clear that the parties are not acting in an agency relationship. Moreover, the Code Share Agreement contains provisions dealing with ticket sales and the agreement contains an integration clause.

Finally, I conclude that the assignment to Raytheon of amounts due under the Code Share Agreement did not deprive Continental of its right to offset. Counsel for the unsecured creditors' committee argues that Continental's right to offset is defeated and invalidated because, prior to taking an offset or freezing the account on January 11, 1996, the Debtor had assigned to Raytheon all amounts payable to the Debtor under the Code Share Agreement. This argument is without merit under section 9–318 of the Uniform Commercial Code. In UCC terminology, Continental is an "account debtor" which owes money to the "Debtor/assignor," GP Express, and Raytheon is the "assignee" or "secured party." Section 9–318 states in pertinent part,

(1) Unless an account debtor has made an enforceable agreement not to assert defenses or claims arising out of a sale as provided in Section 9–206 the rights of an assignee are subject to

(a) all the terms of the contract between the account debtor and assignor and any defense or claim arising therefrom. . . .

Under this section, Raytheon, as an assignee of an account receivable under the Code Share Agreement, is subject to all the terms of the Code Share Agreement and any defense or claim arising under the Code Share Agreement. Continental's right to offset, and its freeze of funds pursuant thereto, is pursuant to rights set forth in the Code Share Agreement. Raytheon's interest is thus subject to the rights of Continental under the Code Share Agreement. Therefore, I conclude the setoff rights granted to Continental under the Code Share Agreement are superior to the rights Raytheon held pursuant to an assignment from the Debtor. *See, e.g., Pioneer Commercial Funding Corp. v. United Airlines, Inc.*, 122 B.R. 871, 883 (S.D.N.Y.1991). Cases relied on by counsel for the unsecured creditors' committee are simply not dispositive because they do not deal with situations involving a contractual right to offset explicitly governed by UCC 9–318(1).

For the reasons stated, I therefore conclude that Continental held a right to offset the $328,756.00 to be advanced under the Code Share Agreement on January 11, 1996, as against Debtor's obligations to Continental under the Code Share Agreement.

### Continental Adequate Protection and Turnover.

■ Continental argues, as a matter preliminary to arguments concerning adequate protection, that the bankruptcy court does not have authority to prevent and bar Continental from taking the offset and that it should be permitted, as a matter of course, to take the offset. Continental's counsel as-

serts that Continental is not a bank, that it should be treated like a trade creditor and that the offset should be permitted. This argument is not persuasive and it is contrary to the Bankruptcy Code. The status of a creditor holding a right to offset on the date of the petition is explicitly governed by the Bankruptcy Code. Indeed, if the court was to summarily permit Continental to take an offset simply because it held that right, the entire statutory scheme of section 553 would be frustrated.

To the extent of its valid right to offset, namely $328,756.00, Continental holds an allowed secured claim under section 506 of the Bankruptcy Code. The collateral is Continental's account payable—its obligation to pay $328,756.00 to Debtor. The rights of Continental, like those of all secured creditors, are substantially modified by the Bankruptcy Code, and Continental's remedies, as they exist under nonbankruptcy law are suspended and to some extent abrogated by federal law. Continental's right to offset is subject to the Bankruptcy Code, in particular, to sections 362, 363 and 542. Under section 362(a)(7), the automatic stay prohibits Continental from taking an offset after the filing of the bankruptcy petition. Section 362(d) sets forth the conditions under which the court is to lift the automatic stay. Section 363 permits the Debtor to use property of the bankruptcy estate and it provides for adequate protection of a secured creditor's interest in collateral. The claim of the Debtor against Continental for payment of monies due under the Code Share Agreement constitutes property of the bankruptcy estate under section 541. Section 542 requires the turnover of amounts payable to the Debtor upon the filing of a bankruptcy case. Reading sections 361, 362, 363, 506, 541, and 542 in light of the facts of this case, I conclude that Continental should not be required to turnover the $328,756.00 to the Debtor, unless its interest is adequately protected. Upon a showing that the interest of Continental is adequately protected, I have authority to order a turnover of funds to the Debtor in order to implement sections 363 and 542.

I conclude that the interest of Continental in the $328,756.00 will not be adequately protected if all the funds are turned over to the Debtor. However, I do conclude that if only $195,000.00 is turned over to the Debtor, Continental will, in fact, be adequately protected by funds held by Continental from future ticket sales respecting passengers to be carried by the Debtor. The adequate protection analysis is particularly difficult in this case because of the conflicting evidence. Continental has presented testimony and documentary evidence which focus on historical financial information. The difficulty is that adequate protection concerns Debtor's future revenue and expenses. The Debtor has introduced a great deal of testimony and documentary evidence projecting revenue and expenses over the coming months. The evidence produced by Debtor as to projected revenue and expenses is not very credible—it does not conform to generally accepted accounting practices and is incomplete and inconsistent. Of course, this is an emergency hearing and there was little time for preparation of exhibits. Having weighed all the evidence carefully, I conclude that Continental will incur a number of risks if funds are turned over and that the adequate protection offered by the Debtor is sufficient only as to $195,000.00.

If the funds are turned over to the Debtor by Continental, the funds constitute cash collateral under section 363 of the Bankruptcy Code. In determining whether or not a Debtor should be given leave by the court to use cash collateral, I am required to apply the standards enunciated by the Eighth Circuit Court of Appeals in the case of *In re Martin*, 761 F.2d 472 (8th Cir.1985). This entails an identification of the risks to be incurred by the creditor if cash collateral is used and an evaluation of the extent to which these risks are adequately addressed by the protections offered by the Debtor.

If funds are turned over to the Debtor, there are three identifiable risks which could result in nonpayment to Continental of funds turned over pursuant to this court order. If the Debtor ceases operating its airline, Continental would have two immediate problems. First, Continental will have sold tickets, un-

der Continental's name, providing for transportation on routes now abandoned or discontinued by the Debtor. I conclude that Continental is in a position, and will remain in a position, to adequately protect itself with respect to these outstanding airline tickets. Continental has several alternatives with respect to such tickets, one of which is to refund the ticket purchase price to the customer. Since Continental will, at all future times, not make payments to the Debtor except with respect to passengers previously flown, I conclude that Continental will hold the purchase money received for unused tickets. Therefore, Continental will be in a position to refund money to customers and to thereby protect itself with respect to unused tickets. If Continental elects to accommodate customers in some other fashion and to incur additional expenses, it is free to do so, but I do not believe that the Debtor is responsible to provide adequate protection for those costs and expenses of re-accommodation. Even if the Debtor is or will be liable for re-accommodation expenses, I have no evidence from which I would conclude that Continental is exposed to a quantifiable cost at this time. There is simply no evidence from which I would conclude that there would be a specific re-accommodation expense. Further, based on evidence presented by the Debtor, I conclude that there would only be nominal re-accommodation expenses, if any. It is, therefore, not necessary for the Debtor to provide any adequate protection to Continental with respect to potential outstanding tickets.

There is a second risk to Continental if the Debtor ceases operation. At the time the Debtor ceases operation, the status of the accounts under the Code Share Agreement between the Debtor and Continental may be such that Continental will not have enough money to pay accrued charges under the Code Share Agreement and reimburse itself fully for any amounts turned over to the Debtor pursuant to this court order. The worst case scenario from Continental's position would occur if the Debtor ceased operating on a Friday immediately after it receives an advance payment from Continental under the Code Share Agreement. However, even in this situation, Continental would hold the proceeds of four days of ticket sales with respect to which GP Express Airlines, Inc. had already flown the passengers. This is the case because of the delay in payment by Continental to the Debtor. Continental makes a payment on Thursday, based on passengers flown through the preceding Sunday. Therefore, if the Debtor ceases doing business on a Friday, Continental will hold the proceeds of ticket sales for flights completed on the preceding Monday, Tuesday, Wednesday and Thursday. In examining the financial projections and the evidence of future revenues and expenses, I conclude that, at minimum, if the Debtor ceases operation on a Friday, Continental will hold approximately $245,000.00 from ticket sales generated by flights during the preceding four days. During this same four day period, the Debtor would have incurred obligations to Continental under the Code Share Agreement in an amount of less than $50,000.00. Thus, even under this worst case scenario of a Debtor shutdown, Continental, after netting out $50,000.00 worth of accrued expenses would still hold $195,000.00 with respect to passengers already flown and transported by GP Express Airlines, Inc. These funds could be used by Continental and applied by Continental to reimburse it for cash collateral used pursuant to this order. I therefore conclude that if the Debtor grants to Continental an Article 9 security interest in all amounts due and owing by Continental to the Debtor postpetition under the Code Share Agreement to secure reimbursement of Continental for funds turned over to the Debtor pursuant to this order, Continental will be adequately protected to the extent of $195,000.00.

A third risk identified generally by Continental is that it is possible for the Debtor's business to slowly deteriorate over time and that, as a result of the erosion of business, the amounts due and payable to the Debtor by Continental under the Code Share Agreement will diminish. There is some evidence before the court that the number of passengers projected to be carried by the Debtor will diminish in the future, however, the Debtor's gross revenue is expected to increase. I conclude that Continental is in a position to monitor ticket sales and that, if

the business of the Debtor starts to erode in an amount sufficient that Continental concludes that its interest in funds turned over to the Debtor is not adequately protected, Continental may seek an emergency hearing for relief from the automatic stay. The Debtor, as part of its adequate protection offer, has consented to an immediate hearing on relief from the automatic stay if a motion is filed by Continental under such circumstances.

I therefore conclude that the Debtor's Motion to Compel Continental to Make Payments due under the Code Share Agreement should be sustained in part. By separate order, Continental will be ordered to immediately turn over to the Debtor the sum of $195,000.00.

### Raytheon's Claim.

■ Raytheon seeks relief from the automatic stay to repossess nineteen aircraft of the Debtor, or in the alternative, for adequate protection. Raytheon also asserts that it holds a duly perfected security interest in any funds turned over by Continental to the Debtor and that it is entitled to adequate protection with respect to Debtor's proposed use of these funds. The Debtor has filed a motion seeking leave of the court to use cash collateral in which Raytheon claims an interest.

I conclude that Raytheon does not hold an allowed secured claim under section 506 in the $195,000.00 required by this order to be turned over by Continental to the Debtor. As a matter of federal law under section 506, the claim of Continental under the Code Share Agreement is treated as secured by accounts payable by Continental to the Debtor pursuant to that agreement. In otherwords, Continental holds an allowed secured claim in this case secured by the $328,756.00 payable. Continental is owed in excess of $328,756.00 and Continental is an undersecured creditor in this case. Therefore, there is no equity in the $328,756.00 to secure the claim asserted by Raytheon. The $195,-000.00 ordered to be turned over by Continental to the Debtor constitutes cash collateral of Continental pursuant to section 363. There is no equity in the $195,000.00 to secure any claim by Raytheon. As between Raytheon and Continental with respect to the $328,756.00, Continental is a secured creditor and a Raytheon is an unsecured creditor under section 506. I therefore conclude that the Debtor is not obligated to provide any adequate protection whatsoever to Raytheon with respect to the Debtor's use of $195,000.00. The Debtor's Motion for Leave to Use Cash Collateral in which Raytheon claims an interest is therefore granted. I conclude that Raytheon has no interest in funds to be turned over to the Debtor pursuant to this order.

■ Raytheon is entitled to be adequately protected with respect to its interest in aircraft. Raytheon holds a duly perfected security interest in nine aircraft owned by the Debtor, and Raytheon is the owner of ten aircraft leased by Raytheon to the Debtor. In the near future these aircraft will not diminish or deteriorate in value if they are properly maintained. To be properly maintained, periodic maintenance must be performed and certain life limited components must be repaired or replaced based on the number of hours of usage. Engines, for example, have to be rebuilt on these aircraft every 6,000 hours at very substantial cost. If the maintenance is not properly performed when due, the aircraft will diminish in value very substantially and very rapidly. I conclude that in order to adequately protect Raytheon respecting aircraft maintenance, the Debtor will have to spend an average of $96.00 for each hour of aircraft operation. This sum is sufficient to protect Raytheon with respect to routine maintenance, as well as the repair and replacement of life limited components such as engines.

A separate order will be entered requiring the Debtor to provide adequate protection to Raytheon respecting aircraft maintenance.

I note that Raytheon is entitled to adequate protection of its interest in the aircraft only as to the condition of the aircraft on the date of Raytheon's motion. Debtor has represented in its financial projections that Debtor plans on spending $408,120.00 on aircraft maintenance during the period of time between January 9, 1996, and February 8, 1996. Debtor will be ordered to spend $408,-

120.00 on maintenance, or deposit in a designated bank account any of such amount not so expended. However, such $408,120.00 shall be deemed applicable to the $96.00 per aircraft hour flown expenditure required by the court's order.

### Relief from Stay.

The pending motions for relief from automatic stay are hereby denied. Continental is adequately protected with respect to the $133,756.00 retained by it because the Debtor does not have access to the funds. I conclude that I should not permit Continental to take an offset until at least after the Debtor has had an opportunity to assume the Code Share Agreement. In connection with any such assumption, it may be that the funds could be applied to cure existing defaults under the Code Share Agreement. This order is thus without prejudice to a further motion for relief from the automatic stay by Continental.

The motion for relief from the automatic stay filed by Raytheon is denied.

Separate orders will be entered consistent herewith.

IT IS SO ORDERED.

### AMENDED ORDER

For the reasons set forth in the court's separate journal entry of today's date,

IT IS HEREBY ORDERED, ADJUDGED AND DECREED,

1. Continental Airlines, Inc. shall, on or before close of business, on Friday, January 26, 1996, by wire transfer, send to the Debtor, GP Express Airlines, Inc., $195,000.00. Debtor's motion (Fil. # 17) is sustained, in part.

2. The Debtor shall promptly execute such documents as are reasonably necessary in the opinion of counsel for Continental to grant to Continental an Article 9 security interest in any and all amounts due and payable now or hereafter from Continental to the Debtor pursuant to the Code Share Agreement in order to secure the repayment of said $195,000.00.

3. By force of this order, Continental is granted a duly perfected security interest in any and all amounts due and payable now or hereafter from Continental to the Debtor pursuant to the Code Share Agreement in order to secure the repayment of said $195,000.00.

4. The Motion for Relief from the Automatic Stay (Fil. # 25) filed by Continental is hereby denied.

5. The Motion for Relief from the Automatic Stay (Fil. # 49) filed by Raytheon Aircraft Credit Corporation is hereby denied.

6. The request by Raytheon for adequate protection is sustained and the Debtor is ordered to provide adequate protection to Raytheon respecting aircraft maintenance, by separate order.

7. Debtor's Motion to use Cash Collateral (Fil. # 28) is sustained in part. The Debtor may use the $195,000.00 turned over pursuant hereto without providing adequate protection to Raytheon.

IT IS SO ORDERED.